## M. A. QUINA EXPORT CO. v. SEEBOLD.

(District Court, S. D. Florida. April 8, 1922.)

No. 569.

1. Shipping ⊚⟶104—Vessel owner may contract to carry contraband goods to blockaded port.

A vessel owner may contract to carry contraband goods, and may also contract to carry such goods to a blockaded port.

2. Shipping ⊚⟶51—Submarine activities of Germany constituted blockade of English ports, amounting to restraint of rulers.

The activities of the German submarines off the coast of the British Isles for the avowed purpose of sinking all vessels entering the forbidden zone was an effective blockade of the English ports, which excused a vessel owner from performing his charter agreement, under the clause exempting restraint of rulers.

3. Shipping ⊚⟶51—Warning of intention to sink all vessels was extraordinary occurrence, beyond control of parties to charter.

The published warning by the German government that it intended to sink all vessels entering the forbidden zone around the British Isles was an extraordinary occurrence, beyond the control of either party to a charter, entered into before the warning was published, for the carrying of a cargo to England.

4. Shipping ⊚⟶51—Charter is frustrated only when change is so great no reasonable man would contract under the circumstances.

A charter agreement to carry a cargo is frustrated only when the change in circumstances is so great that no reasonable man would have entered into the contract under the new circumstances.

5. Shipping ⊚⟶51—Charter held frustrated by notice of Germany's intention to sink all vessels in forbidden zone.

A charter agreement to carry a cargo of lumber to England in a small sailing vessel was frustrated by the German warning of intention to sink all vessels in the forbidden zone around the British Isles, and by the effective efforts of the submarines to carry out the purpose, since no reasonable man would have contracted to perform such a voyage under those conditions, unless the amount of freight would fully repay the value of the vessel.

In Admiralty. Libel by the M. A. Quina Export Company, a corporation, against Theodoro Seebold, to recover damages for breach of a charter party. Libel dismissed.

James F. Glen, of Tampa, Fla., for libelant.
Whitaker, Himes & Whitaker, of Tampa, Fla., for respondent.

CALL, District Judge. In this cause libel was filed June 19, 1918, claiming damages for breach of a charter party between libelant and

the shipowner, dated 16th of February, 1916, whereby the Maria Lorenza, of 299 tons register, after discharging cargo with which she was then loading at Bilboa for Lisbon, should proceed in ballast to a gulf port, subsequently designated as Pensacola, to load for libelant "deals and/or boards" at £23. 15s. per ton St. Petersburg standard hundred, and, being loaded, shall therewith proceed to any port in the United Kingdom not east of Southampton.

The respondent answered on July 2, 1917, and subsequently on May 20, 1921, filed an amended answer by consent of parties, in which the defenses set up in the original answer were to some extent set out more fully. As I understand the matter, the defense is based upon the declaration by Germany of unrestricted submarine warfare against the English, French, and Italian ports, defining a zone of the sea in which any vessel, neutral or otherwise, would be sunk without warning.

The charter party provided that, should the vessel not be at the port of loading on or before June 15, 1916, the charterer should have the option of canceling the charter. January 24, 1917, the time was extended to April 15th following. After the promulgation by Germany of the unrestricted submarine warfare, notice of which was given January 31, 1917, to take effect February 1st following, the respondent refused to have his vessel proceed to Pensacola to load, but sent her to Tampa to load a cargo for him bound to a Spanish port. The charter party contains the following:

"The act of God, restraints of princes and rulers, the king's enemies, fires, floods, frost, droughts, strikes, combinations, or extraordinary occurrence beyond control of either party, * * * mutually excepted, including negligence clause as attached."

The clause attached is as follows:

"The act of God, perils of the sea, fire, barratry of the master or crew, enemies, pirates, thieves, arrests and restraints of princes, rulers, and people, collision, stranding and other accidents of navigation excepted, even when occasioned by negligence, default or error in judgment of the pilot, master, mariners, or other servants of the shipowner."

In 1915 the German government published its list of contraband goods, declaring that articles and materials susceptible of use in war as well as for purposes of peace should be considered contraband of war, under the name of conditional contraband; the twentieth item being all kinds of lumber, rough or treated, etc. In 1916 an additional list was promulgated, in which lumber was again included under the eleventh item. In this paper a hostile port is to be presumed: (a) If goods are destined to be delivered in a hostile port; (b) if the ship is to call at a hostile port.

The respondent claims he was justified in not sending his ship to Pensacola to load because first, there was a restraint of rulers; second, there was an extraordinary occurrence beyond the control of either party; and third, because the contract was frustrated.

The libelant insists that respondent was not excused, because he contracted to carry this cargo during the existence of a state of war, knowing that this cargo was conditional contraband and that under the German rule a vessel carrying contraband up to a certain propor-

tion of her cargo was forfeited, and therefore the vessel's danger, even if there was a blockade, was no greater than she had contracted to assume; but it further insists there was no blockade.

[1] It is recognized law that a vessel owner may contract to carry contraband goods, and in such event he is not excused from complying with his contract because the goods are contraband. He may also contract to carry goods to a blockaded port, and such blockade would not excuse him, provided such contract is not illegal for some reason.

In the instant case the contract was undoubtedly to carry conditional contraband goods, and if, in pursuit of the voyage, the vessel had been captured by the Germans, he might have lost his ship; but, as I understand the contention of respondent, such a contract did not and could not contemplate the dire results to be reasonably expected from penetrating the prescribed submarine zone proclaimed by the Germans around the islands of England, Ireland and Scotland.

[2] Did the submarine activities in the waters of this zone constitute a blockade of the English ports? Without stopping to discuss the definitions given in the law books and the decided cases, I think it was, and judging from the number of ships, both steam and sail, sunk subsequent to February 1st, the day proclaimed for it to go into effect, it was efficiently maintained. Of course, some ships, both steam and sail, got through and reached their destinations; but this is not sufficient to declare the blockade ineffective. The lists attached to the stipulation show the proportion of sailing vessels lost, but that to my mind is of no particular moment.

Here was a power which had been since August, 1914, successfully withstanding the attacks of England, France, and Italy on land, the fighting being in the enemy territory, except for a short time on the Eastern frontier, proclaiming to the world that subsequent to February 1, 1917, it proposed to sink all ships loaded with contraband or otherwise, neutral or enemy, without notice, found within the zone described, and carrying out the warning. Suppose the vessel had been loaded and proceeded on her voyage, and had been notified of this change in conditions since leaving port; would any one be found to say her owner would not have been justified in ordering her to abandon the voyage, or that the master would have been unjustified in abandoning it without such orders? I think not, although she was not a passenger ship with an assorted cargo. That such a condition, brought about by the orders of a government able and willing to maintain such inhuman orders, constitutes a restraint of rulers, I think cannot be gainsaid.

[3] Again, the contract provides that an extraordinary occurrence beyond the control of either of the parties excused the performance of the contract of affreightment. There is no question that such a proclamation as was made by Germany on January 31, 1917, was extraordinary and beyond the control of either party. Was it sufficient, under the terms of the contract, to excuse the performance? It must be borne in mind that at the time of the making of the contract only the ordinary perils of the sea, superinduced by the state of war then existing, such as a danger of capture, etc., were in the contemplation of

the parties. By this proclamation a danger to life by the unwarned sinking of the vessel was added; and that this danger was great, even before warning to the world was given, is evidenced in the sinking of the Lusitania. I think such proclamation was such an extraordinary occurrence, beyond the control of either of the parties, as excused performance of the contract.

[4, 5] Was the contract frustrated? The rule governing in such cases, as I understand it, is that the change in circumstances must be so great that no reasonable man would have entered into the contract in the new circumstances. In addition to what I have said above, it is only necessary to point out that here was a small sailing vessel, of 299 tons burthen, unarmed, with no means of defending herself, and dependent on the wind for her propulsion through the water. The German government, with hundreds of submarines slinking below the surface, with periscope afloat at the approach of a vessel, with high speed on the water and power of propulsion below, carrying the deadly torpedo, was determined to destroy the vessels of all nations, neutral as well as enemy.

It seems to me patent that no reasonable man would under the circumstances enter into such a contract, unless the freight reserved was in such an amount as would fully repay the value of the vessel so risked, and this leaving out of consideration the lives of the crew endangered. That there were men found to take the risk on vessels, steam and sail, is a monument to the men whose patriotism and heroism, or in some instances it might have been cupidity, made it impossible for Germany to carry out her avowed intentions.

I find that the respondent was justified in declining to carry out the charter party. The libel will be dismissed, at the cost of the libelant. It will be so ordered.